JOHN FINNEGAN v. THE DETROIT FREE PRESS COMPANY.

*Libel and slander—Identity of person libeled—Pleading—Evidence.*

1. In this case Mr. Justice MORSE filed an opinion, favoring a reversal for the failure of the trial court to instruct the jury, as requested by the defendant, that if the plaintiff, at and before the publication of the alleged libel, was generally known as " John D. Finnegan," and not as merely " John Finnegan," and that the initial letter had been adopted by him to distin-

guish him from persons known by the latter name, the article complained of will not be presumed to have had reference to the plaintiff, and, as there is no evidence in the case that plaintiff is the person referred to in said article, their verdict must be for the defendant.

2. CHAMPLIN and LONG, JJ., concurred in the reversal of the judgment.

3. SHERWOOD, C. J., and CAMPBELL, J., favored the affirmance of the judgment.

Error to Wayne. (Brevoort, J.) Submitted on briefs November 6, 1889. Decided December 28, 1889.

Case. Defendant brings error. Reversed. The facts are stated in the opinion of SHERWOOD, C. J.

*Black & Wilkins,* for appellant, contended:

1. The publication complained of is not, as a matter of law, libelous on its face as regards plaintiff, because it does not name nor in any way identify or point towards the plaintiff, and it was not written or published concerning him.

2. When the libel does not, on its face, appear to relate to the plaintiff, it must be shown in what way it relates to him, notwithstanding the previous averment that it was published concerning him; citing *Clement v. Fisher,* 7 Barn. & C. 459; and where the plaintiff is not mentioned by name in the publication, such facts and circumstances should be alleged, by way of inducement, as to make it plain that he was the person intended; citing *Miller v. Maxwell,* 16 Wend. 9; *Lewis v. Soule,* 3 Mich. 514; and the innuendo, to wit, the allegation that defendant intended the plaintiff, cannot be made to perform the office of the inducement, and hence it is held that an innuendo cannot be proved; citing *Snell v. Snow,* 13 Metc. 278; *Carter v. Andrews,* 16 Pick. 1; *Gibson v. Williams,* 4 Wend. 320; *Van Vechten v. Hopkins,* 5 Johns. 226; *Hawkes v. Hawkey,* 8 East, 427; *Roberts v. Camden,* 9 Id. 93.

3. The principle in relation to defamatory words, as well as upon libels, is well settled, that the person slandered or libeled must be certain, and that if the words are uncertain, and do not designate any particular person, no averment shall make them actionable; citing Roll. Abr. 81, 1. 25, 79; *Van Vechten v. Hopkins,* 5 Johns. 228; *People v. Cline,* 44 Mich. 290; and see, on the question of identity, *Jackson v. Christman,* 4 Wend. 277,

284; 1 Greenl. Ev. § 493; Odgers, Lib. & Sland. 127–133, and cases cited.

4. If there are circumstances, aside from the use of the name "John Finnegan," which tend to show that the plaintiff is the person libeled, they must be proved, and to this end must be specially alleged in the declaration as matter of inducement; citing *Miller v. Maxwell*, 16 Wend. 9, 17, 18; *Lewis v. Soule*, 3 Mich. 514; *Weiss v. Whittemore*, 28 Id. 366, 371.

5. If the libel cannot, by any fair and reasonable intendment, from the language itself, be construed as reflecting upon the plaintiff, the court will not, in the absence of a *colloquium* pointing to its meaning, put a libelous construction upon it; citing *Capel v. Jones*, 4 C. B. 259; *Snell v. Snow*, 13 Metc. 278; and extrinsic matters cannot be introduced by an innuendo, but, when necessary, must be brought upon the record in the other way; citing *Roberts v. Camden*, 9 East, 93.

6. The article sued upon is not, upon its face, libelous, for it does not contain either the charge of larceny or of arrest for larceny, suggested by the plaintiff's innuendoes, and was not shown, and under the declaration could not be shown, to be libelous by proof of any extrinsic facts or circumstances, and it should not have been allowed to go to the jury.

7. An alleged libel, when relied upon as published, must be construed according to the plain and natural meaning of the language, which cannot be varied or extended by implication or by innuendo; citing *Lewis v. Soule*, 3 Mich. 514; *Weiss v. Whittemore*, 28 Id. 366; *Miller v. Maxwell*, 16 Wend. 9; *Taylor v. Kneeland*, 1 Doug. 67; *Snell v. Snow*, 13 Metc. 278; Townsh. Sland. & Lib. § 141; *Farnsworth v. Storrs*, 5 Cush. 412; *Purdy v. Printing Co.*, 96 N. Y. 372.

8. The principle here laid down as applicable to the identity of the person libeled applies with equal force to the effect and meaning of the alleged libelous matter; citing *Carter v. Andrews*, 16 Pick. 1; *Gibson v. Williams*, 4 Wend. 320; *Van Vechten v. Hopkins*, 5 Johns. 226; *Hawkes v. Hawkey*, 8 East, 427; *Roberts v. Camden*, 9 Id. 93.

9. To enable the plaintiff to introduce testimony tending to prove that the words used should be understood in a sense different from their natural meaning, there must be some prefatory allegation and explanation of such particular meaning of the words, and the *colloquium* should connect with this introductory matter the publication of the words complained of, leaving to the innuendo its proper office of giving to these words the construction claimed for them; citing *Adams v. Stone*, 131 Mass. 433; *McFadin v. David*, 78 Ind. 445; *Schurick v. Kollman*,

50 Id. 336; *Hays v. Mitchell*, 7 Blackf. 117; *Taylor v. Knee-land*, 1 Doug. 67; *Clarke v. Fitch*, 41 Cal. 472; *Nichols v. Pack-ard*, 16 Vt. 83; *Brown v. Brown*, 14 Me. 317; *Harris v. Burley*, 8 N. H. 256; *Jones v. Diver*, 22 Ind. 185; *Ward v. Colyhan*, 30 Id. 395.

10. The court erred in permitting witnesses to state that upon reading the alleged libelous article they understood that it referred to plaintiff. They were not claimed to be in possession of any extrinsic facts that would render their understanding of the article any more valuable than that of any other person; citing *Smart v. Blanchard*, 42 N. H. 137; *Rangler v. Hummel*, 37 Penn. St. 130; *Van Vechten v. Hopkins*, 5 Johns. 226; *Gibson v. Williams*, 4 Wend. 320; *Snell v. Snow*, 13 Metc. 278; *Gribble v. Press Co.*, 37 Minn. 277.

*Charles Kudner* (*Edwin F. Conely*, of counsel), for plaintiff, contended:

1. The construction to be put upon any language, spoken or written, must be that which is consistent with the whole of the speech or writing. Thus the language of any part of a writing is to be construed with reference to the entire writing, and the language of any part of an oral discourse is to be construed with reference to the entire discourse; citing Townsh. Sland. & Lib. §§ 133, 137, and notes; Odgers, Lib. & Sland. 98, and notes; *Morehead v. Jones*, 2 B. Mon. 210.

2. For the purpose of its construction, language is to be regarded not merely in reference to the words employed, but according to the sense or meaning which, all the circumstances of its publication considered, the language may be fairly presumed to have conveyed to those to whom it was published; citing Townsh. Sland. & Lib. § 133, and notes; Locke, Cond. Understg. § 35; *Roberts v. Camden*, 9 East, 93; *Harvey v. French*, 1 Cr. &. M. 11.

3. The intention or motive with which the words were employed is, as a rule, immaterial. If the defendant has in fact injured the plaintiff's reputation, he is liable, although he did not intend to do so, and had no such purpose in his mind when he spoke or wrote the words; citing Odgers, Lib. & Sland. 5, 6, and note *a*, 153, 154; Townsh. Sland. & Lib. (3d ed.) 134 (notes), 142, 681, 683; yet, if an honest mistake is made in an honest attempt to enlighten the public, it must reduce the damages to a minimum, if the fault itself is not serious, and there should be no unreasonable responsibility where there is no actual malice; citing *Bailey v. Publishing Co.*, 40 Mich. 251.

4. The defendant's contention is that defamatory language which may, and in fact does, injure a person, is not actionable, unless so framed as to exclude application to any other person.    The existence of any such rule is denied.   If the article on its face can and does purport to defame some one, whether it touched the plaintiff is a question of fact, and it will make no difference that it is capable of injuring another; citing Odgers, Lib. & Sland. 127, 129; *Maybee v. Fisk*, 42 Barb. 326; *Gidney v. Blake*, 11 Johns. 54; *Falkner v. Cooper*, Carter, 56; *Patterson v. Edwards*, 2 Gilm. 720.

5. Plaintiff may call at the trial his friends, or those acquainted with the circumstances, to state that on reading the libel they at once concluded that it was aimed at the plaintiff; citing Odgers, Lib. & Sland. 129, 539; 2 Stark. Ev. 461: *Smart v. Blanchard*, 42 N. H. 137; *Mix v. Woodward*, 12 Conn. 262; *Goodrich v. Davis*, 11 Metc. 473; *Miller v. Butler*, 6 Cush. 71; *McLaughlin v. Russell*, 17 Ohio, 475; *Smawley v. Stark*, 9 Ind. 386; *Russell v. Kelly*, 44 Cal. 641; *Machine Co. v. Souder*, 58 Ga. 64; *White v. Sayward*, 33 Me. 322; *Cresinger v. Reed*, 25 Mich. 450; *Van Vechten v. Hopkins*, 5 Johns. 211; *Gibson v. Williams*, 4 Wend. 320; *Rangler v. Hummel*, 37 Penn. St. 130; *McCue v. Ferguson*, 73 Id. 333.

Morse, J.   The only error that I can find in this case is the refusal of the court to give the third request of defendant, to wit:

" If you find that at, and for a length of time prior to, the publication of the article sued upon, the plaintiff was universally or generally known as ' John D. Finnegan,' and not as merely ' John Finnegan,' and that such initial letter, ' D,' had been adopted by him expressly to distinguish him from persons known as ' John Finnegan,' then this article sued upon will not be presumed to have had reference to the plaintiff; and, as there is no evidence in the case that he is the person referred to in the said article, your verdict in that case must be for the defendant."

This request should have been given.   If the plaintiff was generally known as " John D. Finnegan," and he himself had assumed that name to distinguish him from " John Finnegan," the use of the name " John Finnegan " by defendant could not be a libel upon plaintiff,

unless malice was shown in the publication, intended against plaintiff, or that the plaintiff was intended as the person mentioned under the name of "John Finnegan," and the publication was made without express malice, but with such want of care that the law would imply it.

I think the verdict, under all the circumstances of the case, was excessive; but this we, as an appellate court, cannot remedy.

. For this reason the judgment must be reversed, and a new trial granted.

CHAMPLIN, J. I concur in the reversal of the judgment.

LONG, J., concurred with CHAMPLIN, J.

SHERWOOD, C. J. The action in this case is for libel, based upon the following article, which appeared in the Detroit Free Press, a newspaper published by the defendant in the city of Detroit, on April 24, 1887, and which article the plaintiff claims was printed and published of and concerning him. It is as follows:

"John Finnegan borrowed Wolfgang Fellers' coat from the latter's saloon on Wednesday night, without the proprietor's consent. Last night he returned to the saloon, and tried to sell Fellers the coat. For this he was arrested, and locked up in the Central station, by officers Cahoon and Daley."

The plaintiff's declaration consists of a single count, and is as follows:

"For that the said defendant, wickedly intending to injure the plaintiff, heretofore, to wit, on the 24th day of April, A. D. 1887, at the city of Detroit, in said county of Wayne, did maliciously compose and publish of and concerning the plaintiff, in a certain newspaper called the 'Detroit Free Press,' a certain false, scandalous, and defamatory libel, containing the false, scandalous, and defamatory matters following, of and concerning the plaintiff, that is to say:

" ' John Finnegan (said plaintiff meaning) borrowed Wolfgang Fellers' coat from the latter's saloon Wednesday night, without the proprietor's consent (the defendant meaning thereby that plaintiff feloniously stole said Fellers' coat). Last night he returned to the saloon, and tried to sell Fellers the coat. For this he (plaintiff meaning) was arrested, and locked up in the Central station, by officers Cahoon and Daley (meaning thereby that plaintiff was arrested for the crime of larceny).'

" By means of the committing of which grievances by the said defendant the plaintiff has been brought into public scandal and disgrace, and greatly injured in his good name, and otherwise injured, to the plaintiff's damage ten thousand dollars; and therefore he brings suit, etc."

The defendant filed a plea of the general issue, and thereunder gave notice:

" That on the trial of the above-entitled cause the defendant will give in evidence,    *    *    *    and will insist in its defense, that, at the time of the publication of the alleged libel counted on by the plaintiff, the defendant was engaged in the publication of a certain newspaper known as the Detroit Free Press; that in the publication of such newspaper it was necessary, and it was the duty the defendant owed to the public at large, for the defendant to gather and publish items of news, and matters of public interest; that in the regular course of defendant's business, and in the pursuit of this business, defendant employed a responsible man, called a 'reporter,' to ascertain each day, from the police stations, all matters of public interest and general importance that had occurred at such stations during the day; that, in order to ascertain such matters, it was necessary for such reporter to visit such police stations each evening, and to make inquiries from the officers in charge at such stations, and to examine the blotter or register at such stations, on which was kept a record of arrests made; that on, to wit, the evening of the 23d day of April, A. D. 1887, the said reporter, in the regular course of his duty, visited the Central police station, in the city of Detroit, and examined the said blotter or register to ascertain what arrests had been made during the day; that on such examination the said reporter found on such blotter a name which appeared to be 'John Finnegan;' that said reporter then inquired of the officers in charge of such police station as to the reason for the appearance of such

name on such blotter, and was informed by said officers that the said party whose name appeared on said blotter as aforesaid had been arrested for stealing, as set forth in the alleged libel counted on by the plaintiff; that the said reporter understood the said name to be 'John Finnegan,' and that he so read such name on the said blotter, without any negligence on his part; that the said reporter wrote the alleged libelous publication set forth in the plaintiff's declaration without any malice on the part of said reporter, and in the belief that the name of the person who had been arrested, as set forth in the alleged libel, was 'John Finnegan;' that the defendant published the alleged libel in good faith, without any malice towards the plaintiff, or towards any other person, and solely in the regular course of defendant's business, and in the pursuit of the duty that the defendant owed to the public at large; that the said defendant afterwards, to wit, on the 25th day of April, A. D. 1887, found out that the name of the person who had been so arrested as aforesaid was not 'John Finnegan,' but was a name which looked like and sounded like 'John Finnegan,' to wit, 'John Finnucan;' that defendant's said reporter had, without any negligence, mistaken such name for 'John Finnegan,' and had so understood such name; and that the falsity of the alleged libelous publication was due to mistake and misapprehension of the facts; that as soon as defendant ascertained these facts and this mistake the defendant published in the next regular issue of the said newspaper, to wit, on the 26th day of April, A. D. 1887, an explanation of the facts, and a correction, in as conspicuous a manner and place in said newspaper as was the article sued on as libelous. The defendant will therefore claim that the said publication was privileged, and will further claim that, if said publication should be held libelous, and not privileged, that the plaintiff can only recover such damages as plaintiff has suffered in respect to his property, business, trade, profession, or occupation, and no other damages."

The "explanation" and "correction" referred to in the notice are as follows:

### "A SUIT FOR DAMAGES.

"Ex-Alderman John Finnegan commenced a suit in the Wayne circuit court yesterday against the Detroit

Free Press for $10,000 damages for alleged libel. On Sunday the Free Press published an item to the effect that John Finnigan had borrowed a certain saloon-keeper's coat without the owner's consent, and had forgotten to return it, for which he was arrested. Through a typographical error the name of the coat-thief was spelled 'F-i-n-n-i-g-a-n,' when it should have read 'Finnecan.'"

Mr. John A. Bell was managing editor at the time the libelous article was published, and Frank H. Wakefield was the reporter who gathered the reports of criminal cases at the police stations, and wrote the article in question, which the manager allowed to be published.

The plaintiff was a well-known and prominent citizen of Detroit, was about 45 years of age, and had resided in the city of Detroit all his life, and during which time he had been a business man, served four or five years upon its common council, and four upon its board of education; and for many years his residence has been at No. 206 Orchard street.

The case has been tried twice in the circuit court for the county of Wayne. On the first trial plaintiff recovered a judgment for $1,500. This verdict was set aside as excessive, and a new trial granted. The new trial has been had, and a verdict obtained against defendant for $800; and the proceedings upon this last trial are now before us for review. The defendant brings the case here by writ of error. The case was submitted on the briefs of counsel, and without oral argument.

Sixteen errors are assigned on the record, relating to the rulings of the court in taking the testimony in the case. The first is that the court allowed any evidence to be given in the case,—

"For the reason that there was no proper *colloquium* in the plaintiff's declaration upon which to found the innuendo that the defendant thereby charged the plaintiff with the crime of larceny."

There is nothing in this objection. There can be no *colloquium* in libel, except that which appears in the libelous article itself, and, with the innuendoes appearing in the declaration, the latter is sufficient, if maintained by proof, to support the action therein stated.

The second assignment of error is that the court permitted the plaintiff to introduce in evidence the " Central Station Blotter." It appeared from the testimony of the defendant's witness that the police reporter obtained his information of what was done, and what occurred before that court, and the action of the police, in part, from this blotter; and, to show the reckless manner and utter want of care exercised by the reporter in this case, the blotter was offered in evidence by plaintiff, by which it appeared the arrest actually made was of one John Finnucan, in plain writing, and that plaintiff's name did not appear on the blotter at all, with or without the middle letter, "D." This testimony was properly admitted. There may be such a degree of recklessness and want of care as to show wantonness and willfulness; and I have no doubt it may be carried to the extent that its effect would tend to show malice. Reckless conduct in publishing a newspaper is no more to be tolerated than in any other kind of business. In this case it appears that Sergeant. Martin, at the police station, narrated to the reporter the circumstances of the case, and did not mention the name of John Finnegan, or any other Finnegan. The reporter did, however, read the blotter, where the name of the arrested person appeared. The reporter says he never looks up the residence of a person charged with crime, and that it is not considered " big news " to report that a man was arrested upon a charge of larceny, unless there are aggravating circumstances. The item in this case, after being written, was brought under the observation of Manager Bell. The care the defendant gave the

matter appears in the testimony of Mr. Bell. On his cross-examination he says that all local news that came in was brought by the city editor to witness; that witness read it before it went up-stairs, so that anything that, in his judgment, was improper, would be suppressed by him, or he would do whatever else was required with it.

" *Q.* How would you be able to tell whether it was proper or not,—of your own intuition?

" *A.* I could not tell of my own intuition.

" *Q.* What means would you take to find out whether anything was false or true?

" *A.* I could not give personal investigation to every item that came in under my charge,—that I saw.

" *Q.* You did not undertake to do that?

" *A.* No, sir.

" *Q.* Did you ever undertake to do anything that way?

" A. Well, very many matters are published locally that are within my own knowledge,—the main events and occurrences; and if I saw that the reporter had made an incorrect statement, if it was within my own knowledge, I would necessarily correct it.

" *Q.* Suppose it was not within your own knowledge?

" *A.* If the item came to me with the appearance of being correct, and with nothing on its face showing that it was not correct, of course, I would pass it.

" *Q.* Suppose, then, an item came in, and you did not happen to know the man, and he was charged with larceny. Would you put it in without an investigation?

" *A.* I would assume that it was true.

" *Q.* You assumed that this article sued upon was true?

" *A.* Yes, sir.

" *Q.* Did you take any pains whatever to see if it referred to any John Finnegan that you knew?

" *A.* I did not.

" *Q.* Did you take any pains whatever to see whether it was true of the supposed John Finnegan?

" *A.* I simply read the item, and sent it up-stairs.

" *Q.* So that, as a matter of fact, you took no pains whatever regarding this item, to see whether the statements were true or false?

" *A.* No, sir."

Witness further testified that, as a general rule, he never undertook to verify statements made in an article like the one sued upon; that when the reporter came in with this item he did not interrogate him as to it; that he did not ask him the source of his information; that he did not ask him who this John Finnegan was, or anything about the facts, or what means he had for believing the item to be true as to anybody. Witness further testified that the Free Press has a telephone, and had telephonic communication with police head-quarters, and that no attempt was made to use it in this case. It would seem that more care than is here shown to protect a man in his reputation for honesty and integrity, and as a law-abiding citizen, which had taken a life-time to establish, ought to have been observed. At the time the libelous article appeared in the Free Press, no other person than the defendant, by the name of " John Finnegan," lived in Detroit."

Under the ruling of the court, against the objection of defendant's counsel, the plaintiff was permitted to show by what name he was known while a member of the common council; that he was known as " John Finnegan." This is defendant's third assignment of error. We see nothing in this of which defendant can complain. It appears in the testimony that plaintiff added, as a middle letter, " D " to his name, while a member of the " National Guards," to distinguish him from another member of the same name, living in the city at that time. For the purpose of showing that there was no other person living in Detroit at the time the article was published bearing the plaintiff's name, and that his name was as stated in the declaration, the plaintiff was permitted to show in evidence—

1. The city directories upon the subject for the years 1886 and 1887.

2. Letters addressed to him while he was a member of the board of education, and continuing to and including 1886.

3. His father's last will, dated in 1871.

4. A bond and mortgage made by himself and mother to the savings bank.

These pieces of testimony were all objected to by defendant's counsel, and exceptions taken to the rulings admitting them, and are all included in the fourth to the eighth assignments of error, both inclusive. We think the objections were properly overruled. The testimony is such as is usually accepted and relied upon to establish the same facts in transactions involving the most important business in life, and I see no reason why it should not be held competent in a court of justice. This is not a criminal case, where the greatest circumspection and care are required. If, however, we were to hold the testimony was not properly admitted, the error is a harmless one, for the reason that it is admitted that the plaintiff's name was " John Finnegan," except as he added the " D," as before stated, and that both mean the plaintiff. The middle letter is no part of a man's name in a civil action; and in no event could the defendant's rights be prejudiced by its use, as the record shows the same disregard and recklessness in the one case as the other.

For the purpose of showing that the article pointed to the plaintiff, and would be most likely to be understood by his acquaintances and friends, when read, as referring to him, several persons residing in Detroit, and who had long known the plaintiff, were asked by plaintiff's counsel, when they were on the stand, to whom did they understand the article to refer when they read it, and what was said about it upon that subject, and its effect. This testimony was objected to as incompetent. It was competent, and the fact as to how the article was understood among plaintiff's acquaintances was one of the most

important in the case. It was the principal element in the damages sustained; and no one knew better, or could speak with more accuracy, than these acquaintances themselves. It was in this way the plaintiff's damages, if any, arose; and proof could not be better made than by those who could speak from their own knowledge upon the subject, and had heard others talk about it. This covers defendant's assignments of error from the ninth to the thirteenth, both inclusive.

The fourteenth assignment relates to the ruling of the court on the defendant's motion to take the case from the jury, and direct a verdict for the defendant. The denial of this motion was proper. The case was clearly one for the jury.

When the reporter, Wakefield, was upon the stand, counsel for the plaintiff asked the witness, upon his cross-examination, the following question:

" Did Sergeant Martin convey the idea, whoever it was, that he had been stealing a coat? "

Witness replied that was the idea he gathered. The court refused to strike out the testimony of this witness, " that he understood that Finnegan had been charged with the crime of larceny," when asked to by defendant's counsel; and these exceptions are the subject of the defendant's fifteenth and sixteenth assignments of error. This testimony was competent on cross-examination. It was entirely proper to show that the offense the witness was then writing up, with the intention of giving it to the public, was one of larceny, and a crime.

At the close of the trial, counsel for defendant presented the following requests to be given in the charge, among others, viz.:

"1. If you find that at, and for a length of time prior to, the publication of the article sued upon, the plaintiff was universally or generally known as 'John D. Finne-

gan,' and not as merely 'John Finnegan,' and that such initial letter, 'D,' had been adopted by him expressly to distinguish him from persons known as 'John Finnegan,' then this article sued upon will not be presumed to have had reference to the plaintiff; and, as there is no evidence in the case that he is the person referred to in the said article, your verdict in that case must be for the defendant.

"2. A name voluntarily assumed by a person for a lawful purpose, though differing from the one given to him by his parents, may become, to all intents and purposes, the name of the person assuming it.

"3. It being conceded that the article upon which suit was brought was not intended to refer to the plaintiff,— that it did not point to him, except in the use of the name 'John Finnegan,'—I charge you that, in order for him to recover in this suit, he must establish by evidence, to your satisfaction, that the effect of the article as it appeared in the newspaper was to point to him, and no other person of the name of 'John Finnegan.' In other words, he must, by his evidence, exclude all inference that the article, upon its face, pointed to any other person than him.

"4. The law only knows one name for a person; and, inasmuch as the plaintiff admits that in 1873, or thereabouts, he assumed the name of 'John D. Finnegan,' to distinguish him from persons of the name of 'John Finnegan;' that since that time he has held office in this city under the name of 'John D. Finnegan,' and always, while acting officially, used that name, and otherwise held himself out to the public as the person of that name, —I charge you that he thus voluntarily assumed that name, and all persons in the community in which he lived had the right to so understand and treat him as the person possessing such name; and he has no right to complain of an injury done to him by the publication of an article which referred to some other person, of a different name, and not intended to refer to him, simply for the reason that some of his neighbors were mistaken in supposing it referred to him.

"5. Actual damages are, in this case, such only as the plaintiff actually suffered. These damages, if any, are to be measured justly and fairly, and as nearly as possible by a money standard for the injury received by him. They

should not be fanciful or imaginary damages, but such only as you can clearly see arise naturally and necessarily from the circumstances of the case. Damages are given as compensation, and as compensation only, for injuries received, and should not exceed the amount of such just compensation; and no exemplary or punitive damages can be added by you, beyond what is based upon the actual injury done to the plaintiff, measured in dollars and cents.

" 6. You should consider the care taken by the reporter in the preparation of the item sued upon; and any of the circumstances, which may have been shown, which would naturally lead him to commit an error, should be considered by you in reduction of the damages, if any, to be awarded to the plaintiff."

The first request was properly refused. The request, taken as a whole, is an instruction to render a verdict for the defendant. Whether the plaintiff was the person intended or referred to in the article as the thief, was a question of fact solely for the jury, under proper instructions from the court.

In regard to the second request, it is not applicable to the case at all. It goes upon the theory that plaintiff assumed a name other than his own, and there is no testimony in the case showing such assumption; and therefore the refusal was correct. The adoption of a middle letter in a name does not make it a new name; neither is it the assumption of another name. And, if he was the only John Finnegan in Detroit, who could the article have referred to, if not to him, or be presumed to have referred to? The person to whom it did refer certainly lived in Detroit.

The third request has the same infirmity as the second. It takes the article out of the circumstances existing at the time it appeared in the paper, and assumes that the plaintiff must prove a negative, viz., that the article pointed to no other person. This was not necessary. If

the article, under all the circumstances, referred to the plaintiff, with such reasonable certainty as to induce the belief that the plaintiff was the man intended, it was sufficient. In such case it is for the defendant to satisfy the jury that not only was it not intended to refer to the plaintiff, but that the article, under no reasonable construction, would be likely to be so understood by the acquaintances of the plaintiff. With a very little care, much less than what is known as "ordinary care," the article could have been prepared so as to have avoided all danger of doing injury of the kind complained of in this case; and if, by so doing, an article does lose a portion of its sensational character, or, as the reporter says, should fail to become "big news," it will not bring pain and anguish to the friends of the injured party, and to himself the mortification and disgrace so often felt by the innocent, and for which the coffers of a reckless press can never make adequate atonement.

The frequency of this class of cases appearing in courts of last resort very clearly indicates that there is a strong public feeling existing that individuals are far too often subjected to injury and wrong through the careless and negligent conduct and management of journalism in this regard. The cases do not arise so much from the avarice of shysters, or the disposition to blackmail the press by unconscionable and adventurous suitors, as counsel for defendant suppose, but rather from a public feeling that the course pursued is wrong; that more care should be used in making attacks upon the character and reputation of private citizens; and that the evil complained of should be abated,—and this feeling is fast ripening into a public sentiment upon this subject. Shysters, blackmailers, and unconscionable and adventurous suitors do not mould or make public sentiment in this country. It springs from a sense of injury, either to person, reputation, character,

or property, and the progress of such sentiment as frequently discloses itself in the jury box as anywhere else; and, however much courts may seek to control it, and preserve the rights of suitors, they are powerless, comparatively, in cases resting so largely on the questions of fact involved.   The request under consideration asks for too much.

The defendant's fourth request invades the province of the jury, and asks the court to assume certain facts which could only be found in this case by the jury, and for that reason was properly omitted from the charge.

The fifth request relates to the subject of damages, and all that was necessary to be placed before the jury contained in this request was given in the charge of the court; and I see no error in refusing to charge as requested.

The sixth request was sufficiently covered by the general charge of the court.

In the argument of counsel for plaintiff upon the facts to the jury, he stated to them what he conceived to be the law upon several points. Exception was taken to these statements. There was nothing objectionable in this. The court could correct him, if any mistakes were made by counsel. The argument of the facts by counsel is made upon his understanding of the law; and, unless permitted to do this, many times the argument would lose very much of its force.

Defendant's assignments of error, twenty-fifth to twenty-eighth inclusive, relate to four separate paragraphs of the charge, taken from that part given upon the court's own motion, and which are as follows:

"I charge you that, in order for him to recover in this suit, he must prove by evidence, to your satisfaction, that the effect of the article, as it appeared in the newspaper, was to point to him, and to no other person by the name of 'John Finnegan.'   A written or printed publication

of a person is libelous on its face, and therefore actionable *per se*, when it charges him with the commission of a crime, or induces the belief that he has committed a crime, or tends to bring him into public disgrace, or imputes something disgraceful to him, or throws odium upon him, or induces an ill opinion of him in the community. Such publication is presumed to be both false and malicious. Whether the article complained of relates to the plaintiff, or was calculated to injure the plaintiff, is a question for you alone to determine, by the facts and circumstances of this case. If the article related to the plaintiff, and was calculated to injure him in respect to his reputation or standing in the community, then, as to him, it is libelous."

"Identity of name is evidence of identity of person."

"If the article related to the plaintiff, and was calculated to injure him in respect to his reputation and standing in the community, then, as to him, it is libelous."

"And right here, let me state to you, gentlemen, that you have heard the article which was published by the defendant two days after the libel was published, and, if you believe it was intended as an apology, you may consider it, as bearing upon the question of exemplary damages."

I have been unable to discover any error in either of these paragraphs, as they stand in the charge as given. The entire charge has been examined, and I have found no fault in it. Of course, identity of name is not conclusive evidence of identity of person.

I do not think the article called an "apology" or "retraction" was either. One thing it does, however. It shows that the defendant regarded the original article referred to as charging the party named as taking the coat with larceny. The article is a simple announcement that the defendant had been sued for libel, and that they had made a mistake, a typographical error, in the article. There is no expression of regret that it had occurred, or intimation that it could have harmed any one, or, if it had, that defendant was desirous of making amends for the injury in any way.

The record shows a fair trial of the cause before a jury, under instructions as to the law more favorable than the defendant had a right to expect. The article is libelous upon its face. It charges John Finnegan with arrest for the commission of a crime. He was known to the manager of the paper, and there was no other John Finnegan residing in Detroit at the time. It is of no consequence, so far as maintaining the action is concerned, that it was not the intention to libel the plaintiff at the time. The acquaintances of plaintiff had no difficulty in determining from the article that the plaintiff was meant. His name was that contained in the article, and it charged him with crime. The rule holds the article libelous *per se* if it charges one with crime, and describes the plaintiff with sufficient certainty to enable his personal acquaintances, on reading it, to apply to him the slanderous imputations; and there is no question but that the party actually arrested lived in Detroit, as well as the defendant. Mistakes will not excuse liability, although they may be urged to reduce the extent thereof, and will often reduce the damages to a minimum, according to the degree of care exercised. Libels are usually published through mistake, indifference, carelessness, negligence, recklessness. But, if the publication is libelous, mistake, indifference, carelessness, negligence, recklessness, go to the *quantum* of damages, not to the right of recovery. The trial judge summed up the law of this part of the case very tersely and very clearly.

"Mistake is not justification, and can only be asserted in mitigation of damages."

The rights of the defendant were well guarded in the charge, in all essential particulars.

"The intention or motive with which the words were employed is, as a rule, immaterial. If the defendant has in fact injured the plaintiff's reputation, he is liable,

although he did not intend so to do, and had no such purpose in his mind when he spoke or wrote the words." Ogders, Lib. & Sland. 5.

"Malice in fact need never be proved at the trial. The words are actionable, if false and defamatory, although spoken or published accidentally, or inadvertently, or with an honest belief in their truth." Id. 6, and note *a*, 153, 154; Townsh. Sland. & Lib. 134 (note 2), 142, 681, 683.

"Yet, if an honest mistake is made in an honest attempt to enlighten the public, it must reduce the damages to a minimum, if the fault itself is not serious; and there should be no unreasonable responsibility where there is no actual malice." *Bailey v. Publishing Co.*, 40 Mich. 257.

But actual damages are always recoverable.

"Character is as sacred as property; and every one is entitled to its protection, under the law, as a fundamental legal right. Such has been, as I conceive, the unquestioned doctrine at all times; and it is the only doctrine under which the reputation of citizens can be preserved from assault. Good faith diminishes the injury, and in many cases may reduce the damage to a minimum; but it is impossible to hold that it entirely destroys the damages, and in civil cases such is not the accepted law."

In this case the plaintiff undertook to satisfy the jury of the application of the libelous article to the plaintiff. The right to do this cannot be denied, but the proofs offered were claimed to be incompetent. As I have already said, I have no doubt of their competency.

"Though the words used may at first sight appear only to apply to a class of individuals, and not to be specially defamatory of any particular member of that class, still, an action may be maintained by any one individual of that class who can satisfy the jury that the words referred especially to himself." Odgers, Lib. & Sland. 128.

"So, if the words spoken or written, though plain in themselves, apply equally well to more persons than one, evidence may be given both of the cause and occasion of publication, and of all the surrounding circumstances affecting the relation between the parties, and also of

any statement or declaration made by the defendant as to the person referred to. The plaintiff may also call at the trial his friends, or those acquainted with the circumstances, to state that on reading the libel they at once concluded that it was aimed at the plaintiff." Odgers, Lib. & Sland. 129, 539; 2 Stark. Ev 461; *Bourke v. Warren,* 2 Car. & P. 307; *Broome v. Gosden,* 1 C. B. 728; *Du Bost v. Beresford,* 2 Camp. 511; *Cook v. Ward,* 4 Moore & P. 99, 6 Bing. 409; *Smart v. Blanchard,* 42 N. H. 137; *Mix v. Woodward,* 12 Conn. 262; *Goodrich v. Davis,* 11 Metc. 473; *Goodrich v. Stone,* Id. 486; *Miller v. Butler,* 6 Cush. 71; *Leonard v. Allen,* 11 Id. 241; *McLaughlin v. Russell,* 17 Ohio, 475; *Smawley v. Stark,* 9 Ind. 386; *Tompkins v. Wisener,* 1 Sneed, 458; *Morgan v. Livingston,* 2 Rich. Law, 573; *Russell v. Kelly,* 44 Cal. 641; *Machine Co. v. Souder,* 58 Ga. 64; *Com. v. Buckingham,* Thatcher, Crim. Cas. 29; *Briggs v. Byrd,* 11 Ired. 353; *Harrison v. Thornborough,* 10 Mod. 196; *Maybee v. Fisk,* 42 Barb. 326; *Gidney v. Blake,* 11 Johns. 54.

When the libel does not, on its face, appear to relate to the plaintiff, it must be shown in what way it relates to him, notwithstanding the previous averment that it was published concerning him. *Clement v. Fisher,* 7 Barn. & C. 459. In this case, however, I think, upon its face, the alleged libel, under the circumstances, appears to relate to the plaintiff; and it seems to me difficult how any other conclusion can well be reached. The judgment should be affirmed.

CAMPBELL, J. I think the error shows nothing which in law should reverse the judgment.